PD-0128-15

FILED IN
COURT OF CRIMINAL APPEALS

APR 13 2015

Abel Acosta, Clerk

(Pause in proceedings.)

THE COURT: Anything further, Ms. Massey?

MS. MASSEY: Not from the State, Your Honor.

THE COURT: Anything further, Mr. Ritchie?

MR. RITCHIE: None from the Defense, Your Honor.

THE COURT: I'm slightly perplexed about why this occurred. I mean, a person of average intelligence or even diminished intelligence should know better than to do this. And there's an indication in Exhibit 2 that you always did that. So it was not an isolated incident.

Ms. Massey, do you have any closing arguments you'd like to make?

MS. MASSEY: Yes, Your Honor.

Based on the severity of this case, the fact that it's not an isolated incident, and his explosive personality disorder that he admits that he has, that he does have tendencies towards anger and violence, the State believes that it's in the best interest of the community that he be sentenced to the Institutional Division of TDCJ.

But if the Court chooses not to do that, we would ask that he be at least required to do an anger

ELIZABETH BOURQUIN, CSR
29TH JUDICIAL DISTRICT COURT, PALO PINTO COUNTY, TEXAS

Being convicted due to mental illness

management class and not be near his wife or child, if that's what they ask, and it's my understanding they have asked, for at least two years.

THE COURT: Well, let me just ask you that. I mean, that's -- can that be imposed -- you're saying that can be imposed as a term and condition of probation?

MS. MASSEY: It can be a condition of probation that he not be near his wife and child for as long as the Court deems proper.

THE COURT: But that would not be enforceable like a protective order would be, though.

MS. MASSEY: No. It would be a violation of probation if he did that.

THE COURT: All right.

MS. MASSEY: This would just be extra protection for the family.

THE COURT: Right. Okay.

All right. Can you speak to the mindset of this offense, though, that I was alluding to? Why would this occur? I mean, based upon -- what's your position in that regard?

MS. MASSEY: Based on the evidence, the only conclusion that I can come up with is that he was angry with the child for whatever reason, whether it was

ELIZABETH BOURQUIN, CSR
29TH JUDICIAL DISTRICT COURT, PALO PINTO COUNTY, TEXAS

Evidence does not show without any doubt that = Acire caused this. Being convicted because JE mental sickness not guilty

because he dirtied his diaper or because he wasn't being still --

THE COURT: Okay.

MS. MASSEY: -- and did this out of anger.

THE COURT: Okay.

All right, Mr. Ritchie.

MR. RITCHIE: My take on the actual incident is -- give me a second to articulate what I really think about what the evidence shows, Judge, is that when you first look at it in a vacuum, it's -- you think, well, who would do that conduct?

But then you go, how can a three-year-old having a diaper changed and wiggling around and doing certain things? I mean, it's just -- you go, wow, how can that happen?

I think you get into inadvertence; I think you get to recklessness, which is also part of that statute. And, you know, there's a lesser included going down. That's a state jail felony offense. But -- and I don't think that's what the Court is asking about.

But I don't -- to me, this evidence is that Johnny did not do it a numerous number of times or probably the same result would have happened because of the fingernails or whatever. But I think it was a -- it happened spur of the minute. The child's wiggling

ELIZABETH BOURQUIN, CSR
29TH JUDICIAL DISTRICT COURT, PALO PINTO COUNTY, TEXAS

around, going around, maybe not behaving.

And so, Judge, it is what it is. I think your perception is the same as everybody else's. But I think the practicalities of this happening in the -- in the near future are just -- I mean, I don't think there's any threat to society about Johnny going around changing diapers on kids, okay, number one.

I mean, it's -- the kid is bound to be old enough, since he's going to be five, where the same kind of conduct wouldn't occur. Maybe other conduct would occur. I mean, that's always a concern for us. But that conduct can't -- surely wouldn't.

I don't know -- I honestly don't know where the CPS case is in this system. I'm assuming -- and the Court may know -- if it's in this court, then it certainly would be supervised visitation, and he wouldn't have the opportunity to be around the kid, kind of like a protective order, without supervision. And I don't know that.

THE COURT: I don't know -- I don't know the answer. I have so many of them I can't --

MR. RITCHIE: I understand, Judge. And I -- but I would -- we both know -- CPS is in it somewhere, I believe.

And as a condition of probation, I

would -- I would think that this Court could just make it an order of the Court for him not to be around, until further order, and let him amend his conditions of probation through a lawyer, if the Court felt comfortable about that. And certainly, anger management and those kind of things.

But I don't think Johnny is a threat to society. I think he's genuinely concerned about the damage that he did to the marriage and still wants to get back with her, but I don't -- I don't believe he is a -- I don't think the evidence shows that this is a violent predator like that.

I think it was a total lapse of judgment to even attempt to change a diaper that way. I mean, I think that's -- that's true.

THE COURT: Well, I mean, the pictures are very serious to me. I mean they depict very serious injuries.

MR. RITCHIE: Yes, sir.

THE COURT: Almost shocking of the conscience really is the way I see it. And I just -- that's why I say, I just don't understand how a human being can do that to their own son. That's really troubling to me.

MS. MASSEY: Your Honor, actually, his

caseworker is here in the gallery today, and she's advising that it is open simply for the fact that he has been in jail pending this outcome. But the child's been reunified, and services have been worked by the mother.

(Pause in proceedings.)

THE COURT: Mr. Davis, could you stand, please.

THE DEFENDANT: (Complies.)

THE COURT: All right, Mr. Davis. You've come before the Court today, and you entered a plea of guilty to the offense alleged in the indictment in this case.

You were duly admonished by the Court about the consequences of that plea. You've asked the Court to consider to give you -- to put you on probation, but I told you, prior to accepting your plea, that you were not going to be allowed to withdraw that even if I rejected what you were asking me to do.

I found that your plea was knowingly, intelligently, freely, and voluntarily given, and I accepted that plea of guilty. And you -- there's been evidence presented, which goes to the effect of punishment or sentence or what to do with you in this case.

So, first of all, I'm going to find you

VERIFICATION OF MENTAL ILLNESS
Being convicted By courts due to
mental illness not evidence

46

guilty of the offense alleged in the indictment in this case, sir.

THE DEFENDANT: If it would make you -- if it could speed it up, could I speak, please?

THE COURT: What?

THE DEFENDANT: Could I please speak to the Court, please?

THE COURT: I'll give you just a second.

THE DEFENDANT: Sorry.

THE COURT: No. I want you to go ahead and speak to the Court now before I assess punishment.

THE DEFENDANT: Okay. In 2007 or 2008, I was -- I went to MHMR with my -- me and last wife was getting a divorce. I was still -- I had the explosive temperament disorder and depression, and that was it. He just, you know, let me go.

And then I went -- just started recently going back to and getting -- through MHMR in Weatherford, I was talked to -- I was mentioned that word to -- "explosive" to my counselor, and she said bipolar.

And I had an appointment, I think, for October 2nd or October 4th, I was supposed to go back to MHMR, and I was going to request to be put on medication for it.

Q. Okay. And what did you determine from discussions with the mother?

A. She told me that she didn't know of any foul play or wrongdoing, that she just assumed that he had fell off, and this conversation that she had with the defendant. That's what the defendant told her, that he had fell and hurt himself that way.

Q. And did you have -- did you interview the defendant?

A. Yes, I did.

Q. And what did you find out from the interview of the defendant?

A. He told me that -- oh, I spoke with him for quite a while about the whole incident, and towards the interview (sic), he said that the injury happened when he was actually changing his diaper.

He was moving around -- the kid was moving around while he was changing his diaper, and in order to get him to be still, he lifted him up by the base of his penis and that in turn, that caused the injury.

And he --

Q. Go ahead.

A. He told me at that time -- that's when we knew that injury had occurred, because he said that he did cry a little bit and that he went ahead and put the

diaper on and kissed him and went on.

Q.    And based on your investigation, who caused the injuries to the victim?

A.    Johnny Davis, Sr.

MS. MASSEY:  I'll pass the witness.

CROSS-EXAMINATION

BY MR. RITCHIE:

Q.    Jeremy, as you know, I represent the defendant. I'm Richard Ritchie.  And you and I have never talked about this case before today, have we?

A.    No, we have not.

Q.    And you -- actually, you interviewed Darlene Davis, which is Johnny's wife; is that correct?

A.    Yes.

Q.    And let's establish the age of that child backwards in there about September.  I think his date of birth was '09 --

A.    Okay.

Q.    -- in September, so he would have been about three?

A.    Uh-huh.  That's correct.

Q.    Three years -- I believe four.  I believe he would have been four.

A.    He had just turned.

Q.    Just turning four about that time; is that

ELIZABETH BOURQUIN, CSR
29TH JUDICIAL DISTRICT COURT, PALO PINTO COUNTY, TEXAS

correct?

A. That is correct.

Q. So coming up in September this year, he'd be five?

A. Yes.

Q. All right. And you interviewed -- and I think that injury was on the Saturday prior to Labor Day. Does that sound correct?

A. Yes, that is correct.

Q. All right. And as you stated, I mean, everybody -- that -- all of the reports indicate that it was sometime on a Saturday evening, and Johnny was in charge. Is that your understanding of the changing diapers, taking care of the kid?

A. Yes, that is my understanding.

Q. And they call him J.D.; is that correct?

A. Yes.

Q. And all of these interviews were voluntary; they came in, correct?

A. It was voluntary.

Q. All right. And you actually interviewed him, I believe, on the 9th of September maybe -- no. 19th. I'm sorry.

A. Yes, the 19th.

Q. The 19th of September. But the actual event

happened sometime before that, correct?

A. Yes.

Q. All right. And I notice on there that there's no serious bodily injury. As a matter of fact, the child was back in school, I believe, on the following Monday after Labor Day, right?

A. I believe that's when he went back, yes.

Q. The child missed about a week of school; is that correct?

A. Yes.

Q. And so -- and so if the injury happened on Saturday of Labor Day weekend, I believe the parents were treating the laceration with Neosporin.

A. Yes, that's what they said. *(handwritten: WITNESS DARLINE DAVIS AND DEFENDANT)*

Q. Is that basically right?

A. (Nods head affirmatively.)

Q. In fact, I think that's what Stephanie Giles said when you interviewed her, right?

A. Yes, that's correct.

Q. And the child is -- certainly, the child has recovered now, correct?

A. I believe so.

Q. Right. It's not serious bodily injury, in your opinion, is it?

A. No, it's not.

*Statement from witness Stephanie Giles have been designed to create the perception that I was irresponsible due my son's injury without any factual basis*

*unwarranted deduction*

Q. Okay. Isn't it fair to say, based upon all of your interview and all of your investigation, that the parents didn't attempt to hide this injury from the school system or Head Start? Right?

A. They did send him to school --

Q. I'll give you that.

A. -- so...

Q. I mean, the kid returned to school. Head Start gets -- I mean, gets upset when they have to change a three-year -- the kid's diaper, and they find it, and they're kind of shocked, right?

A. Yes, they were.

Q. I understand.

As a matter of fact, Johnny, the defendant, came to get the kid from school that very Tuesday, I believe; is that accurate?

A. After the -- yes, after they found the injury.

Q. After they found it, he came.

A. He did come.

Q. And then some days later, he comes in to interview with you when you call him, right?

A. Yes, he did.

Q. Okay. And both parents are treating this child with Neosporin, and they don't call law enforcement. I'm talking about Johnny or Darlene or anybody. They

system, or is it even in the system yet, or do you know?

A. It should -- Investigator Henard -- yes, it should be in the system. I don't know the status of their case, though.

MR. RITCHIE: I pass the witness.

REDIRECT EXAMINATION

BY MS. MASSEY:

Q. Just clear up one little thing.

When Mr. Davis went and picked up the child from Head Start, did he tell them what happened?

A. He told them -- he told them a story of what happened.

Q. Okay. And what did he tell them?

A. He told them about the fall.

Q. And when you interviewed him, did he immediately tell you what had occurred?

A. No, he did not.

Q. And did he tell you the story of him falling also?

A. I believe in the beginning of it, he did. We did speak about that.

Q. But he did eventually tell you what happened?

A. In the end, yes, he did.

MS. MASSEY: No further questions.

MR. RITCHIE: I have no further questions.

A.    No, sir.

Q.    Did you graduate from Springtown?

A.    Yes, sir.

Q.    And that's high school, correct?

A.    Yes, sir.

Q.    Do you have any other education at all besides that?

A.    No, sir.

Q.    And you've got some physical disabilities; is that right?

A.    Yes, sir.

Q.    Can you name some of those?

A.    I've got a partially fused -- partially fused left hip, and I've got the beginning stages of degenerative disc disease in my back.

Q.    Okay.  You walk with a pretty noticeable limp; is that correct?

A.    Yes, sir.

Q.    You're in pain a lot; is that right?

A.    Yes, sir.

Q.    Okay.  And have you been diagnosed with things going on in -- mentally?

A.    Yes, sir.

Q.    Bipolar?

A.    Bipolar, yes, sir.

Q. Okay. Certainly depression and anxiety over the years; is that right?

A. Yes, sir.

Q. And you've off and on taken medicine for that for a long period of time; is that right?

A. Yes, sir.

Q. Sometimes you get it -- get the medicine correctly; sometimes you don't, right?

A. Yes, sir.

Q. Today, as we're sitting here, since you've been in custody, there's nothing that the jail has given you that causes you not to understand what we're doing today, though, is it?

A. No, sir.

Q. You totally understand, and you understand what I'm talking about, what the Court's talking about, and nothing about medication is keeping you -- hindering you in any way of communicating --

A. No, sir.

Q. -- is that right?

A. Yes.

Q. Okay. Do you know what your IQ level has been established at? *mental competence* NOT ESTABLISHED

A. No, sir.

Q. We're going to get to the night -- or the

*IQ level never mentioned before*

Do you understand all of that?

A.    Yes, ma'am.

Q.    And you thoroughly believe that you can and will do all of that?

A.    Yes, ma'am.

Q.    Even though you don't have a car and a ride?

A.    I'd find a ride with a friend of mine.  I'll just have to -- you know...

Q.    And if I told you that your wife didn't want you back in the house, would you be accepting of that, if she told you that?

A.    It'd hurt, but I -- I want to be back with her.  This was an accident.  I didn't do this -- I want to stop any disability, stop and go back to work and learn how to be a better father and husband.

Q.    Now, in the medical records that I introduced earlier, there's a statement from your wife that you had been diagnosed with an explosive personality?

A.    Yes, ma'am.

Q.    And that means that you're prone to anger and violence.

A.    Yes, ma'am.  But at the time, I was unaware what that meant.

Q.    But you admit that you do have that?

A.    Yes, ma'am.  That's one reason I'm trying to

Statements from witness have been designed to create the perception that I was responsible for my son's injury (victim) without any factual basis unwarranted deductions and hearsay

get the prescription to get the medicine to get this condition under control.

MS. MASSEY: I'll pass the witness.

REDIRECT EXAMINATION

BY MR. RITCHIE:

Q. And, Johnny, that's why, if you get placed on probation, you can get some anger management and some help; is that correct?

A. Yes, sir.

Q. Because you don't want anything bad to happen to your son. This has -- this has been very difficult on you, hasn't it?

A. Yes, sir.

MR. RITCHIE: I pass the witness, Your Honor.

MS. MASSEY: Your Honor, may I have a moment?

THE COURT: Yes. Can I have that exhibit, Exhibit 2?

(Pause in proceedings.)

THE COURT: Ms. Massey?

I'm sorry. I didn't -- is that all you have, Mr. Ritchie? Did you rest?

MR. RITCHIE: I had passed the witness, Your Honor.